IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| GREENBERG & LIEBERMAN, LLC,<br><br>  Plaintiff<br><br>v.<br><br>JOHN DOES 1–20;<br><br>BRIDGERS (entity unknown);<br><br>DJI-PAY (entity unknown),<br><br>BUTTER NETWORK (entity unknown),<br><br>  Defendants,<br><br>and<br><br>BITGET, BYBIT, HITBTC,<br><br>BINANCE, OKX, TETHER Limited, Inc. and Tronify<br><br>  Relief Defendants. | Civil Action No. 8:26-cv-00187-JRR<br><br>Judge Julie R. Rubin |

SECOND AMENDED VERIFIED COMPLAINT

Plaintiff Greenberg & Lieberman, LLC ("G&L"), by and through undersigned counsel, alleges as

follows:

I. NATURE OF THE ACTION

1.  This is an action seeking equitable and other relief to preserve, trace, and recover

cryptocurrency stolen from attorney escrow accounts through a coordinated computer-

enabled fraud and the misuse of stolen confidential access credentials.

2. The theft involved computer-enabled fraud, social engineering, and misuse of confidential access information, followed by rapid laundering of digital assets across multiple blockchain addresses and platforms. Additional operational details are described in sealed exhibits.

3. The cryptocurrency at issue is specific, identifiable property that is identifiable on public blockchains by transaction hash, address, and timestamp. Plaintiff seeks equitable restitution and recovery of that specific property (and its proceeds), not merely a money judgment, as well as to identify the perpetrators to ensure that both Plaintiff's and its client's trade secrets have not been disseminated.

4. Plaintiff's forensic investigation has been documented in reports and addenda attached under seal as Exhibits A–G, including updates dated January 16, 2026; January 30, 2026; February 2, 2026; February 4, 2026; and February 11, 2026. These reports identify additional touchpoints at other virtual asset service providers and laundering pathways relevant to preservation and recovery.

5. All blockchain wallet addresses, account identifiers, transaction hashes, and trace-path specifics referenced herein are set forth exclusively in Sealed Exhibit 1 and the sealed forensic reports (Sealed Exhibits A–G). No such identifiers are included in the public text of this Second Amended Verified Complaint.

6. The forensic investigation has revealed that the theft and subsequent laundering were carried out by or on behalf of a sophisticated Organised Criminal Group ("OCG") operating at scale, as evidenced by (a) the use of professional-grade "smurfing" techniques to fragment stolen Bitcoin into dozens of small transactions; (b) cross-chain conversion of approximately $886,298 in stolen funds into USDT on the TRON blockchain through Defendant Bridgers'

unlicensed swapping service; (c) the convergence of all converted USDT at a single hub address that has processed over $4.2 million in USDT across 324 transactions since October 31, 2025; (d) further distribution through at least nine (9) unidentified Virtual Asset Service Providers ("VASPs") with combined throughput in excess of $700 million; and (e) the use of the Butter Network as an additional cross-chain aggregation protocol to further obscure the trail. The details of these findings are set forth in Sealed Exhibits A–G.

7.   Upon information and belief, Plaintiff is not the only victim of the criminal enterprise described herein. The forensic evidence reveals that the convergence wallet through which Plaintiff's stolen funds were routed processed over $4.2 million in USDT since October 31, 2025, of which only approximately $ 960,891.24 has so far been attributed to Plaintiff's stolen funds. The remaining approximately $3.3 million is believed to have been derived from other victims of the same or related fraudulent schemes operated by the same Organised Criminal Group. Similarly, the network of unidentified VASPs to which Plaintiff's funds were distributed has processed combined throughput exceeding $711 million, the vast majority of which is unrelated to Plaintiff and is indicative of a large-scale criminal operation affecting numerous victims. Plaintiff anticipates that discovery in this action will reveal additional victims and the full scope of Defendants' criminal enterprise.

II. PARTIES

8.   Plaintiff Greenberg & Lieberman, LLC is a Maryland limited liability company with its principal place of business at 1750 H St., NW, Suite 360, Washington, D.C. 20006, with additional offices in Silver Spring and Olney, Maryland. Plaintiff operates as a law firm and provides escrow services, including escrow services for cryptocurrency transactions.

9.  Defendants John Does 1–20 are individuals and/or entities whose true identities are currently unknown. Plaintiff will seek leave to amend to name Defendants upon discovery of their identities through third-party records and blockchain analysis.

10. Relief Defendant Bitget is a virtual asset service provider and cryptocurrency exchange that offers custodial accounts and trading, including deposits and withdrawals of digital assets through its websites, mobile applications, and APIs. Upon information and belief, Bitget is operated by BGR Tech Limited, a company incorporated in the Republic of Seychelles, and maintains operational infrastructure outside the United States, including a reported operational headquarters in Singapore. Bitget is also connected to the United States through corporate and operational contacts, including (a) a U.S.-registered entity identified as Bitget Technology Group LTD (Colorado) and (b) U.S.-based business and/or records addresses in the Denver, Colorado area reported in public regulatory materials. Bitget is named solely as a Relief Defendant because it possesses, custodies, or controls proceeds of the theft and/or the account-level records necessary to identify the recipient account(s) and preserve evidence. No wrongdoing is alleged against Bitget; Plaintiff seeks only preservation of records and equitable relief with respect to proceeds in Bitget's custody.

11. Bitget has purposefully availed itself of the United States market, including by obtaining and maintaining U.S. intellectual-property rights. Bitget is the owner of the U.S. trademark BITGET, Registration No. 8087736, covering, among other things, software and financial services related to cryptocurrency trading, electronic funds transfer, money transfer, and related technology and platform services. Bitget's U.S.-directed commercial activity, together with its custody or control of theft proceeds and related records, supports the exercise of personal jurisdiction and equitable relief.

12. Upon information and belief, Defendant Bridgers (entity presently unknown) operates and profits from an internet-accessible cross-chain swap and routing service (the "Bridgers Service") that computes routes and causes execution of swaps and cross-chain transfers through one or more smart contracts and integrated third-party liquidity sources. The Bridgers Service is accessible through the web interfaces identified in Sealed Exhibits A–G, is offered to users in the United States through an interactive web-based platform without meaningful geographic restriction, and is designed to facilitate cross-chain movement of digital assets—including U.S.-dollar stablecoins—across multiple blockchains, including Bitcoin (BTC), Ethereum (ETH), and TRON (USDT-TRC20), without requiring user registration or identity verification (KYC).

13. Upon information and belief, Bridgers operates without registration or licensure as a money services business or virtual asset service provider in jurisdictions where it transacts business, and without adequate AML/KYC controls. Bridgers is named as a Defendant because, as shown by the forensic tracing and on-chain analysis set forth in Sealed Exhibits A–G, the proceeds of the theft were routed through Bridgers-associated contracts and/or addresses as part of the laundering pathway, and Bridgers processed and benefited from the movement and conversion of those proceeds through its routing and fee-generating functionality. The specific transaction identifiers supporting these allegations are set forth in Sealed Exhibits A–G. To the extent the precise operating entity is not yet confirmed, Plaintiff will identify it through expedited discovery, including domain, hosting, payment, and blockchain attribution records.

14. Defendant Butter Network (entity presently unknown) operates and profits from an internet-accessible cross-chain swap and routing service marketed as "ButterSwap" (the

"Butter Service") that computes routes and causes execution of swaps and cross-chain transfers through Butter-associated smart contracts and integrated third-party liquidity sources. The Butter Service is accessible through the web interfaces identified in Sealed Exhibit 1 and Sealed Exhibits A–G and supports cross-chain activity involving, among others, TRON and Ethereum—the networks implicated in the laundering pathway traced in this action. Butter promotes the Butter Service as an "omnichain interoperability hub," and Butter's published Terms of Service define "Butter Network" as the entity responsible for developing and maintaining the ButterSwap interface and related services. The Butter Service is offered to users in the United States through an interactive web-based interface without meaningful geographic restriction, and it facilitates the cross-chain movement of digital assets—including U.S.-dollar stablecoins—across multiple networks.

15. Upon information and belief, Butter Network (i) operates the Butter Service web interface(s) and routing logic used to generate and submit swap/bridge instructions, (ii) deploys, maintains, upgrades, or otherwise causes the operation of the Butter-associated smart contracts and related components used to process routed cross-chain transactions, and (iii) collects fees or other consideration in connection with routed transfers, including per-transaction bridging fees paid to or through the Butter system for "messengers" or relayers that facilitate delivery and execution on destination chains. Butter also publicly represents compliance- and security-facing integrations or partnerships, including with AML tracing tooling (MistTrack/SlowMist) and with CertiK, reflecting commercial relationships that include U.S.-based operations and are relevant to purposeful availment and the ability to monitor and respond to illicit flows.

16. As shown by the forensic tracing and on-chain analysis set forth in Sealed Exhibits A–G, proceeds of the theft, or funds commingled therewith, were routed through and/or received from Butter-associated contracts and addresses as part of the laundering pathway. Sealed Exhibits A–G identify the specific transaction hashes, contract addresses, and destination addresses demonstrating that Butter Network's service processed and benefited from the movement and conversion of the traced proceeds, including transfers to and/or through one or more downstream virtual asset service providers that received Plaintiff's traced funds.

17. Butter Network is named as a Defendant because the traced proceeds were processed through Butter-associated contracts and routing pathways and because Butter derived fees or other benefit from that processing, as evidenced by the on-chain identifiers in Sealed Exhibits A–G, not merely because Butter published software that could be misused by others.

18. Upon information and belief, Defendant DJI-Pay (entity presently unknown) is a virtual-asset trading and payment platform that marketed itself as "India's Trusted Collection & Payment Platform," offering USDT-to-Indian-Rupee conversion and collection/payment services through a web-based platform identified in Sealed Exhibits A–G. Upon information and belief, DJI-Pay operated or was associated with the domain and web presence identified in Sealed Exhibits A–G (including archived captures) and advertised USDT exchange and settlement through a "Hybrid Fund Channel." DJI-Pay's only publicly identifiable contact information included a WhatsApp number with a Hong Kong country code, as set forth in Sealed Exhibits A–G. DJI-Pay is alleged to have transacted business affecting the United States by operating an interactive online service available to U.S.-located users and by receiving and processing digital assets—including U.S.-dollar stablecoins—originating from a U.S.-based victim and traced theft proceeds.

19. Upon information and belief, DJI-Pay operates without registration or licensure as a money services business or virtual asset service provider in jurisdictions where it transacts business, and without adequate AML/KYC controls. DJI-Pay is named as a Defendant because, as shown by the forensic tracing set forth in Sealed Exhibits A–G, it was used as a destination platform and/or intermediary in the laundering pathway for proceeds of the theft, and it facilitated the receipt, conversion, and/or further transfer of stolen cryptocurrency, thereby assisting the dissipation and obfuscation of cryptocurrency. The specific identifiers and forensic support are set forth in Sealed Exhibits A–G.

20. Relief Defendants Bybit, HitBTC, Binance, OKX, and Tronify are virtual asset service providers and cryptocurrency exchanges that offer custodial accounts, trading, and deposit/withdrawal services for digital assets. They are named solely as Relief Defendants to the extent they possess, custody, or control proceeds of the theft and/or the account-level records necessary to identify the recipient accounts and preserve evidence. No wrongdoing is alleged against these Relief Defendants; Plaintiff seeks preservation of records and equitable relief with respect to proceeds in their custody, consistent with the Court's prior injunctive order. To the extent additional virtual asset service providers are identified through the sealed forensic reports, Plaintiff will seek appropriate relief and/or leave to amend as necessary.

21. Relief Defendant Bybit has purposefully availed itself of the United States market. Upon information and belief, Bybit operates through a Delaware subsidiary, BYBIT (USA), INC., Company No. 6502632, a domestic corporation registered in Delaware with its registered agent at Northwest Registered Agent Service, Inc., 8 The Green, Suite B, Dover, Delaware 19901. Bybit has also filed U.S. trademark applications, including Serial Nos. 90872593 and 90872606, covering services related to cryptocurrency exchange and trading, reflecting its

intent to establish and protect its brand in U.S. commerce. Bybit's U.S.-directed corporate presence and intellectual-property filings, together with its custody or control of theft proceeds and related records, support the exercise of personal jurisdiction and equitable relief.

22. Relief Defendant Binance has purposefully availed itself of the United States market. Binance is the owner of the U.S. trademark BINANCE, Registration No. 6316156, with a first use in commerce date of September 11, 2017. Upon information and belief, Binance operates a U.S.-facing exchange through BAM Trading Services, Inc. d/b/a Binance.US, and conducts substantial U.S.-directed commercial activity through U.S.-facing services, regulatory engagements, and commercial relationships. Binance's U.S.-directed commercial activity and intellectual-property rights, together with its custody or control of theft proceeds and related records, support the exercise of personal jurisdiction and equitable relief.

23. Relief Defendant OKX has purposefully availed itself of the United States market. OKX is the owner of the U.S. trademark OKX, Registration No. 7239259, with a first use in commerce date of January 18, 2022. Upon information and belief, OKX also operates through a Colorado corporation identified as OKX Global Digital Exchange Ltd, Company No. 20251186096, in good standing, with a registered agent address at 1550 Wewatta Street, Denver, Colorado 80202. OKX's U.S.-directed commercial activity, corporate presence, and intellectual-property rights, together with its custody or control of theft proceeds and related records, support the exercise of personal jurisdiction and equitable relief.

24. Upon information and belief, Relief Defendant HitBTC is a virtual asset service provider that maintains custodial accounts and records relevant to the proceeds identified in Sealed Exhibits A–G. Plaintiff will identify HitBTC's operating entity and jurisdictional contacts

through expedited discovery, including domain, hosting, and blockchain attribution records, and will amend as appropriate.

25. Upon information and belief, Relief Defendant Tronify is a virtual asset service provider incorporated in the United Kingdom that facilitates cross-chain transactions and maintains records relevant to the proceeds identified in Sealed Exhibits A–G. Plaintiff will identify Tronify's U.S. contacts, if any, through expedited discovery, including corporate, domain, payment, and blockchain attribution records, and will amend as appropriate.

26. Relief Defendant Tether Limited Inc. (sometimes referenced as "Tether Limited," together with its related Tether-affiliated entities involved in issuing and administering USD₮/USDT) is the issuer and administrator of the USD₮ stablecoin and maintains the technical ability to freeze, block, and/or redeem ("burn" and reissue) USDT associated with specific blockchain addresses through its contract-level controls on supported networks. Tether is named solely as a Relief Defendant to the extent it can freeze, preserve, or facilitate the recovery of USDT proceeds of the theft and/or identify and preserve records relating to such proceeds and the addresses and accounts associated with them. No wrongdoing is alleged against Tether; Plaintiff seeks only preservation of records and equitable relief with respect to proceeds and substituted assets subject to Tether's control.

27. Tether has purposefully availed itself of the United States market and the protections of U.S. law, including by securing and maintaining U.S. trademark rights and/or applications for TETHER and related marks covering software and financial/technology services relating to digital assets and stablecoins, and by maintaining U.S.-directed commercial activity tied to USD₮'s widespread use in U.S.-connected transactions and platforms. Upon information and belief, Tether has also regularly engaged with U.S. governmental and judicial processes,

including by acting on U.S. law-enforcement requests and court orders to freeze or administer USDT associated with identified addresses. Tether's U.S.-directed intellectual-property rights and U.S.-connected commercial activity, together with its unique ability to freeze and preserve USDT proceeds traced in Sealed Exhibits A–G, support the exercise of personal jurisdiction and the Court's equitable authority to order preservation of proceeds and related records.

### III. JURISDICTION AND VENUE

28. Plaintiff has posted the $100 bond required by the Court's Temporary Restraining Order (ECF No. 10) on January 30, 2026. Plaintiff further represents that Relief Defendant Bitget has been served, including by personal delivery to Bitget CEO Gracy Chen by Lori Bembanaste at a cryptocurrency conference in Miami Beach, Florida on January 30, 2026, as more fully reflected in Plaintiff's Certificate of Service.

29. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the Defend Trade Secrets Act, 18 U.S.C. § 1836, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962.

30. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367.

31. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, including the unauthorized access to Plaintiff's systems and the theft from escrow accounts maintained in Maryland.

IV. FACTUAL ALLEGATIONS

A. Plaintiff's Escrow Services and Security Measures

32. G&L maintains attorney escrow accounts for the benefit of clients, including accounts holding cryptocurrency. These accounts are protected by industry-standard security measures, including hardware wallet devices (Ledger devices), secure storage of recovery phrases, and restricted access protocols.

33. As part of its escrow services, G&L maintains Confidential Access Information, including recovery phrases (also known as seed phrases or mnemonic phrases), private-key access material, wallet derivation paths, and related security information that enables access to and control over cryptocurrency wallets. As part of its reasonable security measures, Plaintiff retained MetroMSP (metromsp.com) in 2017, a network security firm, to maintain endpoint protection intended to keep the firm's computers safe and resistant to intrusion. MetroMSP failed to detect that Mr. Lieberman's laptop was no longer protected after mid-November 2025.

34. The Confidential Access Information constitutes trade secrets within the meaning of 18 U.S.C. § 1839 and Md. Code Ann., Com. Law § 11-1201 because: (a) it derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use; and (b) it is the subject of efforts that are reasonable under the circumstances to maintain its secrecy, including physical security of Ledger devices, restricted access, and secured systems.

35. Plaintiff's clients include both small mom and pop companies, mid-sized companies as well as numerous public fortune 100 to 500 companies. The investigation has made it clear

that Defendants did not access, view, or exfiltrate any data other than the keys to the crypto through the compromised computer.

B. The Fraudulent Scheme

36. On January 14, 2026, Defendant Does executed a coordinated cyberattack targeting G&L's cryptocurrency escrow accounts.

37. The unauthorized transfer resulted in the theft of approximately 14.78650191 BTC and 100 ETH from Plaintiff's escrow-controlled wallets.

38. [REDACTED: blockchain addresses/transaction identifiers. See Sealed Exhibit 1 and Sealed Exhibits A–G.]

39. Defendant Does created a spoofed interface designed to mimic the legitimate Ledger Live application. The spoofed interface was designed to deceive users into believing they were interacting with authentic Apple store and Ledger software.

40. Through social engineering and/or other means, Defendants caused the spoofed interface to be presented to Mr. Lieberman the only person in the firm with access to G&L's escrow wallets. The spoofed interface falsely represented that entry of recovery phrases was required for legitimate security or access purposes.

41. Relying on these false representations, Mr. Lieberman entered the recovery phrases and other Confidential Access Information into the spoofed interface, which transmitted that information to Defendants.

42. Using the misappropriated Confidential Access Information, Defendants accessed G&L's cryptocurrency wallets without authorization and transferred approximately $2,700,000 or more in cryptocurrency out of the escrow accounts.

43. Defendants rapidly laundered the stolen cryptocurrency through multiple blockchain addresses in an effort to obscure the trail and frustrate recovery.

C. Tracing and Identification of Proceeds

44. Plaintiff retained MIRIS International  ("Investigators") to perform blockchain forensic analysis to trace the stolen cryptocurrency. Investigators traced stolen funds from Plaintiff's escrow-controlled wallets through intermediary hops to multiple downstream virtual asset service providers. Among other things, Investigators observed that, beginning on or about January 29, 2026, approximately 14 BTC held in monitored destination wallets began moving and was rapidly fragmented, with significant portions routed through Defendant Bridgers and the Butter Network and swapped into USDT on the TRON blockchain, followed by onward transfers through extensive address networks and deposits to accounts and/or deposit addresses associated with Relief Defendants Bybit, Binance, HitBTC, and OKX, and to additional unknown VASPs.

45. Investigators further documented additional movement on or about February 3, 2026 involving further BTC fragmentation, additional Bridgers swaps into USDT, and transfers to Defendant DJI-Pay and other unknown VASPs, including unknown VASPs that received funds directly from Binance, Bybit, and the Butter Network, as detailed in sealed Exhibits A– G.

46. Plaintiff also filed a complaint with the FBI's Internet Crime Complaint Center (IC3) on January 18, 2026 (Submission ID: provided upon request).

47. The forensic analysis traced a portion of the stolen funds—specifically, 0.52172461 BTC—to an account hosted by Relief Defendant Bitget on January 16, 2026.

48. [REDACTED: blockchain addresses/transaction identifiers. See Sealed Exhibit 1 and Sealed Exhibits A–G.]

49. [REDACTED: blockchain addresses/transaction identifiers. See Sealed Exhibit 1 and Sealed Exhibits A–G.]

50. The forensic analysis in Exhibit A hereto confirms that the Bitget-hosted account received funds directly linkable to the initial unauthorized transfers from Plaintiff's escrow wallets. The cryptocurrency can be identified and traced through blockchain forensic analysis from Plaintiff's escrow wallets through intermediate addresses to the specific Bitget-hosted account.

51. Bitget maintains identifying records associated with the receiving account(s), including KYC documentation, IP logs, login metadata, withdrawal records, internal ledger history (trades/conversions), and linked wallet information.

52. [REDACTED: blockchain addresses/transaction identifiers. See Sealed Exhibit 1 and Sealed Exhibits A–G.]

53. The forensic investigation further revealed that Defendant Bridgers was used as an intermediary in the laundering chain to convert stolen cryptocurrency from one form to another and to obfuscate the origin, trail, and destination of the stolen assets.

54. Investigators documented that on January 29, 2026, approximately 14 BTC was moved and broken into smaller fractions, of which 6.05189112 BTC was sent to the Bridgers swapping service and converted into 466,634.26422 USDT on the TRON blockchain through 58 separate transactions—a money laundering technique known as "smurfing" designed to evade detection thresholds enforced by blockchain surveillance tools.

55. Subsequently, on February 3, 2026, an additional 4.3156885 BTC was moved and split, with 2.3904248 BTC sent to Bridgers in 21 small increments and swapped for 185,446.066852 USDT. In total across both waves, approximately 8.44 BTC was converted through Defendant Bridgers into approximately $ 960,891.24 in USDT through 79 separate smurfing transactions.

56. Additionally, smaller amounts of BTC were sent directly to exchanges, including approximately 0.1331128 BTC to Binance and approximately 0.2064 BTC to HitBTC across multiple transactions.

57. Bridgers operates a cryptocurrency swapping or exchange service that facilitates the conversion of digital assets without requiring meaningful identity verification or maintaining adequate transaction records.

58. Upon information and belief, Bridgers is not registered or licensed as a money services business, money transmitter, or virtual asset service provider in any jurisdiction, and does not maintain anti-money laundering or know-your-customer compliance programs as required by applicable law. Bridgers' decentralized design, lack of custodial oversight, and fast cross-chain functionality make it particularly attractive to actors seeking to obscure the origin of funds and distribute proceeds across less regulated networks such as TRON.

59. Bridgers' service was instrumental in breaking the direct chain of custody between the initial theft and the ultimate deposit of proceeds at downstream exchanges, thereby facilitating the laundering of stolen assets and frustrating recovery efforts. The specific transaction identifiers and trace-path details demonstrating Bridgers' role are set forth in sealed Exhibits A–G.

60. The forensic investigation also identified that Defendant DJI-Pay, an India-based cryptocurrency exchange, received proceeds of the theft and/or served as a destination platform in the laundering pathway.

61. Investigators traced a transfer of 2,992 USDT derived from Plaintiff's stolen funds to DJI-Pay on or about February 4, 2026. Upon information and belief, DJI-Pay operates as a virtual asset trading platform without registration or licensure as a money services business or virtual asset service provider in any jurisdiction in which it transacts business, and without adequate anti-money laundering or know-your-customer compliance controls.

62. DJI-Pay's website, identified in Sealed Exhibits A–G, has been archived and displays hallmarks consistent with Crystal Intelligence's classification of DJI-Pay as an 'Illegal service,' including the absence of verifiable corporate information, the use of only a messaging application number with a Hong Kong country code as the sole point of contact, and the provision of USDT-to-Indian-Rupee conversion services.

63. DJI-Pay facilitated the receipt, conversion, and/or further transfer of stolen cryptocurrency. DJI-Pay is believed to maintain account records, transaction histories, and identifying information relating to the accounts that received proceeds, which are critical to identifying the perpetrators and recovering the stolen assets. The specific transaction identifiers and forensic support are set forth in sealed Exhibits A–G.

64. Investigators' forensic analysis further revealed that all USDT converted from Plaintiff's stolen BTC through Bridgers ultimately converged at a single TRON wallet address identified in Sealed Exhibits D and F. Since October 31, 2025, this convergence wallet has received and sent over $4.2 million in USDT across 324 transactions, of which approximately $ 960,891.24 has been attributed to Plaintiff's stolen funds.

65. Additionally, approximately 5,188 USDT of Plaintiff's stolen funds were directly traced to specific Binance deposit wallets attributed to the laundering operation, consisting of deposits of approximately 1,700 USDT, 2,000 USDT, and 1,488 USDT, as detailed in Sealed Exhibits A–G.

66. The volume, velocity, and pattern of transactions at this convergence address are inconsistent with a manually operated personal wallet and are strongly indicative of an automated, organized laundering operation. From this convergence wallet, Plaintiff's traced funds (and commingled proceeds) were distributed onward through multiple distinct addresses and transaction routes to at least nine unidentified Virtual Asset Service Providers ("VASPs") on the TRON blockchain.

67. These unidentified VASPs exhibit characteristics consistent with unlabeled or unidentified exchanges, crypto casinos, or over-the-counter (OTC) trading desks, with individual throughput ranging from approximately $3 million to as high as $296 million and individual transaction counts reaching as high as 3,018,983. Combined, these nine unidentified VASPs have processed throughput exceeding $711 million. The details of each unidentified VASP, its throughput, and its connections to known exchanges are set forth in Sealed Exhibit G.

68. The forensic analysis further established that several of the unidentified VASPs that received Plaintiff's traced funds also received substantial funds directly from known, regulated exchanges—including Binance, OKX, Bybit, and the Butter Network (a cross-chain aggregation protocol). For example, one unidentified VASP received over $7.16 million in USDT directly from OKX; another received approximately $10 million in USDT directly from Binance; another received over $1.1 million from Bybit and approximately

$499,888 from Binance; and yet another received over $1.5 million from Binance. Additionally, one unidentified VASP received over $831,311 in USDT directly from the Butter Network. These amounts represent funds flowing from regulated entities to the unidentified VASPs, and the regulated entities' records are therefore critical to identifying the operators of the laundering network.

69. This finding is significant because these regulated exchanges and protocols maintain identifying records, including KYC documentation and transaction logs, for account holders who sent funds to the unidentified VASPs. Accordingly, the records of these regulated entities represent critical investigative leads for identifying the individuals or entities operating the unidentified VASPs and, by extension, the persons behind the laundering network. These connections and the specific transaction pathways are set forth in Sealed Exhibits D and F.

70. As of February 2, 2026, Investigators confirmed that 100 ETH and approximately 7.94810888 BTC from the original theft remain on cold wallets controlled by Defendants and are being monitored for any subsequent movement. Any additional movement will be the subject of supplemental forensic reports and, as appropriate, further motions for relief.

D. Ongoing Harm and Need for Immediate Relief

71. Without immediate preservation and equitable relief targeted to the proceeds and related identifying information, Defendants may dissipate remaining assets and destroy or conceal evidence needed to identify the wrongdoers, recover the stolen property and disseminate Plaintiff's and Plaintiff's client's trade secrets.

72. The Confidential Access Information obtained by Defendants remains compromised and in Defendants' possession. Unlike a password that can be changed, the cryptographic relationship between a seed phrase and its derived wallet addresses is mathematically fixed and permanent. This creates an ongoing threat that Defendants may continue to exploit the stolen credentials, attempt to access related wallets using similar derivation paths, or disclose the information to third parties, causing further irreparable harm that cannot be remedied by monetary damages alone.

73. Because Defendants are unknown, operate across jurisdictions, and can transfer or withdraw digital assets in minutes, delay will likely render final relief ineffectual. Once the proceeds are withdrawn from an exchange or converted through additional hops, recovery becomes substantially more difficult or impossible.

74. Critical identifying evidence is uniquely within the custody of Relief Defendants Bitget, Bybit, HitBTC, Binance, OKX, and Tronify, including KYC records, IP/login metadata, device identifiers, internal ledger history, withdrawal destinations, and linked accounts. Without immediate preservation, such evidence may be overwritten in the ordinary course, deleted, or rendered unavailable.

75. The TRON wallet addresses identified in the sealed exhibits as part of the laundering network hold USDT, a centralized stablecoin issued by Tether Limited. Unlike decentralized cryptocurrencies such as Bitcoin, USDT is centrally controlled and administratively mutable, meaning Tether Ltd retains the ability to freeze, blacklist, or remint USDT tokens in response to legal requests or internal risk assessments. Tether has complied with multiple U.S. law enforcement requests in the past, including coordination with the U.S. Department of Justice, the FBI, and the Treasury Department's OFAC sanctions enforcement, and has frozen

hundreds of millions of dollars across thousands of addresses. The TRON wallet addresses listed in the sealed exhibits may qualify for freezing by Tether in relation to the theft of Plaintiff's funds and likely other forms of criminality.

## V. CLAIMS FOR RELIEF

COUNT I
Computer Fraud and Abuse Act (18 U.S.C. § 1030)

76. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

77. Defendants violated 18 U.S.C. § 1030(a)(2)(C) by intentionally accessing protected computers without authorization and thereby obtaining information from those protected computers.

78. Defendants violated 18 U.S.C. § 1030(a)(4) by knowingly and with intent to defraud accessing protected computers without authorization, and by means of such conduct furthering the intended fraud and obtaining things of value—namely, the Confidential Access Information and cryptocurrency—exceeding $5,000 in value during a one-year period.

79. Defendants violated 18 U.S.C. § 1030(a)(5)(A) by knowingly causing the transmission of a program, information, code, or command—specifically, the spoofed Ledger interface—and as a result of such conduct, intentionally causing damage without authorization to protected computers.

80. Plaintiff suffered damage and loss by reason of Defendants' violations, including loss of cryptocurrency exceeding $5,000, costs of responding to the offense, and other consequential damages.

81. Plaintiff is entitled to relief under 18 U.S.C. § 1030(g), including compensatory damages, injunctive relief, and other equitable relief.

COUNT II
Fraud (Intentional Misrepresentation)

82. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

83. Defendants, through the spoofed Ledger interface and related communications, made false representations of material fact, including that the interface was legitimate Ledger software and that entry of recovery phrases was required for secure wallet access.

84. Defendants knew the representations were false, or made them with reckless disregard for their truth, and intended to deceive and induce reliance.

85. Plaintiff and/or persons acting on its behalf reasonably relied on Defendants' misrepresentations by entering Confidential Access Information into the spoofed interface.

86. As a direct and proximate result of Defendants' fraud, Defendants obtained the Confidential Access Information and stole cryptocurrency from Plaintiff's escrow accounts, causing damages exceeding $2,700,000.

87. Defendants' conduct was willful, wanton, and malicious, entitling Plaintiff to an award of punitive damages.

COUNT III
Defend Trade Secrets Act (18 U.S.C. § 1836)

88. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

89. Confidential Access Information constitutes trade secrets within the meaning of 18 U.S.C. § 1839 because it derives independent economic value from not being generally known and was subject to reasonable measures to keep it secret.

90. Defendants misappropriated the Confidential Access Information by improper means, including deception, unauthorized access, and exfiltration through a spoofed interface.

91. used and/or disclosed the Confidential Access Information to access wallets and steal assets, causing actual loss and unjust enrichment.

92. Confidential Access Information is used in, and the misappropriation implicates, a product or service used in or intended for use in interstate or foreign commerce.

93. Plaintiff is entitled to relief under 18 U.S.C. § 1836(b), including injunctive relief to prevent continued use/disclosure, damages, exemplary damages for willful and malicious misappropriation, and attorneys' fees.

COUNT IV
Maryland Uniform Trade Secrets Act (Md. Code Ann., Com. Law § 11-1201 et seq.)

94. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

95. The Confidential Access Information constitutes trade secrets under Maryland law, and Defendants acquired, disclosed, and used such information through improper means.

96. Defendants' misappropriation caused Plaintiff and its clients damages, including actual loss and unjust enrichment.

97. Plaintiff is entitled to relief permitted by Maryland law, including injunctive relief, damages, and attorneys' fees where authorized.

COUNT V
Conversion

98. Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

99. Plaintiff and its clients had a right to possession of the cryptocurrency held in the escrow wallets.

100.    Defendants exercised unauthorized dominion and control over the cryptocurrency, which constitutes specific, identifiable personal property.

101.    exercise of dominion and control was inconsistent with and in defiance of Plaintiff's and its clients' rights.

102.    As a direct and proximate result, Plaintiff and its clients were deprived of their property and suffered damages.

COUNT VI
Civil Conspiracy

103.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

104.    Defendants knowingly agreed and acted in concert with one another to commit computer fraud, theft, trade secret misappropriation, and related unlawful acts against Plaintiff.

105.    Overt acts were committed in furtherance of the conspiracy, including creation of the spoofed interface, deployment of the interface to capture credentials, unauthorized access to Plaintiff's wallets, laundering of stolen cryptocurrency, use of Defendant Bridgers' unlicensed swapping service to convert and obfuscate the stolen assets, and routing of proceeds through Defendant DJI-Pay to further dissipate and conceal the proceeds.

106.    As a direct and proximate result of Defendants' conspiracy, Plaintiff suffered damages.

COUNT VII
Unjust Enrichment

107.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

108.    received and retained stolen cryptocurrency (or its proceeds) that rightfully belongs to Plaintiff and its clients.

109.     Defendants' retention of the cryptocurrency and its proceeds is unjust under the circumstances, as Defendants obtained the property through fraud, theft, and unauthorized access.

110.     Plaintiff is entitled to restitution of the cryptocurrency or its value.

COUNT VIII
Equitable Restitution / Constructive Trust (Against Relief Defendants Bitget, Bybit, HitBTC, Binance, OKX, Tether and Tronify)

111.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

112.     [REDACTED: blockchain addresses/transaction identifiers. See Sealed Exhibit 1 and Sealed Exhibits A–G.]

113.     The proceeds in the custody of Relief Defendants Bitget, Bybit, HitBTC, Binance, OKX, and Tronify can be identified and traced through blockchain forensic analysis from Plaintiff's escrow wallets through intermediate addresses to specific accounts hosted by those Relief Defendants. Plaintiff is entitled to recover those identifiable proceeds or their substitutes under the principles of equitable tracing. See Restatement (Third) of Restitution and Unjust Enrichment § 58 (2011).

114.     No Relief Defendant has a superior equitable interest in those proceeds as against Plaintiff and the true owners of the stolen property.

115.     Equity requires the imposition of a constructive trust and/or equitable lien over the proceeds and an accounting sufficient to identify subsequent transfers and recipients.

COUNT IX
Civil Theft (Md. Code Ann., Cts. & Jud. Proc. § 3-1701)

116.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

117.    Defendants, by deception—specifically, through the spoofed Ledger interface and false representations—obtained and withheld property from Plaintiff.

118.    Defendants' conduct constitutes theft as defined under Md. Code Ann., Crim. Law § 7-104, which includes obtaining control over property by willful deception.

119.    Plaintiff suffered actual damages exceeding $2,700,000 as a direct result of Defendants' theft.

120.    Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-1701, Plaintiff is entitled to recover compensatory damages, plus an additional amount of up to $1,000 or threefold the value of the stolen property (whichever is greater), plus reasonable attorneys' fees and costs.

COUNT X
Trespass to Chattels

121.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

122.    Plaintiff and its clients had a possessory interest in the cryptocurrency held in the escrow wallets, which constitutes personal property (chattels).

123.    Defendants intentionally interfered with Plaintiff's possessory interest by accessing the wallets without authorization and transferring the cryptocurrency without consent.

124.    Defendants' interference caused harm to Plaintiff by dispossessing Plaintiff of the cryptocurrency and diminishing its value to Plaintiff.

125.    As a direct and proximate result of Defendants' trespass to chattels, Plaintiff suffered damages.

COUNT XI

Aiding and Abetting Conversion and Money Laundering (Against Defendants Bridgers and DJI-Pay)

126.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

127.    Defendant Bridgers, by operating an unlicensed cryptocurrency swapping and exchange service, knowingly or recklessly provided substantial assistance to the other Defendants in converting stolen cryptocurrency from one form to another and in obfuscating the origin, trail, and destination of the stolen assets, thereby facilitating the laundering of proceeds and frustrating Plaintiff's recovery efforts.

128.    Upon information and belief, Bridgers operates without registration or licensure as a money services business, money transmitter, or virtual asset service provider in any jurisdiction, and without anti-money laundering or know-your-customer compliance programs required by applicable federal and state law, including the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., and its implementing regulations. Bridgers' failure to maintain such controls enabled the conversion and obfuscation of stolen assets without meaningful identity verification or transaction monitoring.

129.    Defendant DJI-Pay, by operating an unlicensed India-based cryptocurrency exchange, knowingly or recklessly provided substantial assistance to the other Defendants by receiving, converting, and/or further transferring proceeds of the theft, thereby facilitating the dissipation and concealment of stolen assets.

130.    Upon information and belief, DJI-Pay operates without registration or licensure as a money services business or virtual asset service provider in any jurisdiction in which it transacts business, and without adequate anti-money laundering or know-your-customer compliance controls. DJI-Pay's failure to maintain such controls enabled the receipt and

further movement of stolen proceeds without meaningful identity verification or transaction monitoring.

131.     As a direct and proximate result of the substantial assistance provided by Defendants Bridgers and DJI-Pay, Plaintiff has been unable to recover the full amount of stolen cryptocurrency and has suffered damages, including the loss of proceeds that were converted, obfuscated, or dissipated through these Defendants' platforms.

COUNT XII
Racketeer Influenced and Corrupt Organizations Act — 18 U.S.C. § 1962(c) (Against All direct Defendants)

132.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

133.     At all times relevant hereto, Defendants constituted an "enterprise" within the meaning of 18 U.S.C. § 1961(4), namely an association-in-fact of individuals and entities who, although maintaining distinct roles, functioned as a continuing unit for the common purpose of stealing cryptocurrency and laundering the proceeds. The enterprise included the individuals who created and deployed the spoofed Ledger interface, the individuals who initiated the unauthorized transfers, the operators of Defendant Bridgers' swapping service, the operators of Defendant DJI-Pay, and the individuals controlling the convergence wallet and associated laundering infrastructure.

134.     The enterprise engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

135.     Defendant conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5), consisting of at least two acts of racketeering activity within a ten-year period, including but not limited to:

(a) Wire fraud, in violation of 18 U.S.C. § 1343, through the transmission of the spoofed Ledger interface via the internet, the electronic transmission of captured credentials to Defendants, and the electronic initiation of unauthorized cryptocurrency transfers;

(b) Computer fraud, in violation of 18 U.S.C. § 1030, through the unauthorized access to Plaintiff's computer systems and cryptocurrency wallets;

(c) Money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, through the fragmentation of stolen Bitcoin into dozens of small transactions ("smurfing"), the cross-chain conversion of stolen BTC to USDT through Defendant Bridgers, the routing of converted USDT through the convergence wallet and extensive intermediary address networks on the TRON blockchain, and the deposit of proceeds into accounts at multiple exchanges and unidentified VASPs;

(d) Theft from interstate commerce, in violation of 18 U.S.C. § 659, through the theft of cryptocurrency held in escrow accounts used in interstate commerce; and

(e) Transportation of stolen property in interstate or foreign commerce, in violation of 18 U.S.C. § 2314, through the transfer of stolen cryptocurrency across state and national boundaries via blockchain networks and cryptocurrency exchanges.

136.     The pattern of racketeering activity is evidenced by, among other things: the planning and execution of the phishing attack; the coordinated extraction of cryptocurrency from multiple wallet addresses; the systematic laundering of proceeds through Defendant Bridgers in 79 separate smurfing transactions across two waves; the use of a centralized convergence wallet that has processed over $4.2 million; the distribution to at least nine unidentified VASPs with combined throughput exceeding $711 million; and the ongoing

monitoring evasion and asset concealment activities documented in the sealed forensic reports.

137.    As a direct and proximate result of Defendants' pattern of racketeering activity conducted through the enterprise, Plaintiff has been injured in its business and property, including but not limited to the loss of cryptocurrency valued at approximately $2,700,000, costs of forensic investigation, costs of responding to the security breach, harm to client relationships, disruption of business operations, and ongoing monitoring and remediation expenses.

138.    Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover threefold the damages it has sustained, together with the cost of this suit, including reasonable attorneys' fees.

COUNT XIII
RICO Conspiracy — 18 U.S.C. § 1962(d) (Against All direct Defendants)

139.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

140.    Defendant knowingly and willfully conspired and agreed with the other Defendants to violate 18 U.S.C. § 1962(c), as alleged herein.

141.    In furtherance of the conspiracy, Defendants committed the overt acts described in the foregoing paragraphs, including the creation and deployment of the spoofed interface, the unauthorized access and transfer of cryptocurrency, and the multi-stage laundering operation using Bridgers, the convergence wallet, DJI-Pay, and the network of unidentified VASPs.

142.      a direct and proximate result of Defendants' RICO conspiracy, Plaintiff has been injured in its business and property, and is entitled to recover threefold damages, together with the cost of suit, including reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

COUNT XIV
Tortious Interference with Business Relations (Against All direct Defendants)

143.      Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

144.      Plaintiff maintained ongoing, valuable business relationships with its escrow clients and prospective clients, including relationships involving the custody, management, and transfer of cryptocurrency and other digital assets, as well as traditional financial escrow services.

145.      Defendants knew or should have known of Plaintiff's business relationships with its clients, including the fact that Plaintiff served as an escrow agent and fiduciary for clients' cryptocurrency and other assets.

146.      Defendants intentionally and improperly interfered with Plaintiff's business relationships by executing the cyberattack, stealing cryptocurrency from Plaintiff's escrow accounts, and compromising Plaintiff's security systems and confidential information, thereby undermining Plaintiff's ability to perform its escrow obligations and maintain the trust and confidence of its clients.

147.      As a direct and proximate result of Defendants' tortious interference, Plaintiff has suffered and continues to suffer damages, including but not limited to loss of existing client relationships, diminished ability to attract and retain new clients, reputational harm, and the costs of security remediation and client notification.

VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment and award the following relief:

A. Equitable relief imposing a constructive trust and/or equitable lien over proceeds of the theft (and their identifiable substitutes) held by Defendants and/or in the custody or control of Relief Defendants Bitget, Bybit, HitBTC, Binance, OKX, and Tronify;

B. An order requiring immediate preservation of records and electronically stored information by Relief Defendants Bitget, Bybit, HitBTC, Binance, OKX, and Tronify, and by Defendants Bridgers and DJI-Pay, and permitting expedited discovery narrowly tailored to identifying the recipient accounts, associated KYC, access logs, and subsequent transfers of the proceeds;

C. Injunctive relief to prevent ongoing misuse or disclosure of the misappropriated Confidential Access Information;

D. Compensatory damages against Defendants in an amount to be proven at trial, including consequential damages;

E. Treble damages pursuant to 18 U.S.C. § 1964(c) for Defendants' violations of the Racketeer Influenced and Corrupt Organizations Act;

F. Treble damages pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-1701;

G. Punitive damages for Defendants' willful, wanton, and malicious conduct;

H. Exemplary damages and attorneys' fees as authorized under the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3);

I. Attorneys' fees and costs as authorized under 18 U.S.C. § 1964(c), Md. Code Ann., Cts. & Jud. Proc. § 3-1701, and other applicable law;

J. Pre- and post-judgment interest;

K. Costs of suit; and

L. Such relief as may be appropriate to the extent that discovery reveals other similarly situated victims of Defendants' criminal enterprise;

M. Such other and further relief as the Court deems just and proper.

VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: February 18, 2026

/s/ Stevan Lieberman
Stevan Lieberman
Member, Greenberg & Lieberman, LLC

*Counsel hereby certifies that counsel has a signed copy of the foregoing Verification available for inspection at any time by the Court or a party to this action.

Respectfully submitted,

GREENBERG & LIEBERMAN, LLC

By: /s/ Stevan Lieberman   February 11, 2026
Stevan Lieberman (Bar No. 448218)
1750 H St. NW. Suite 360, Washington, D.C. 20006
Telephone: (202) 625-7000, Cell: (202) 270-4802, Fax: (202) 625-7001
Email: stevan@aplegal.com

Counsel for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, the foregoing Second Amended Verified Complaint was filed electronically via the Court's CM/ECF system. Because Relief Defendants

have not entered their appearances a copy of this filing will also be served on all relief

Defendants via email and portals, and Tether was sent a copy of all filings concomitantly with

filing.  The following emails and online systems will be / were used:

**Tether:** inforequests@tether.to

**Bitget:** lawenforcement@bitget.com and regulatory@bitget.com

**Bybit:** Uses Kodex Global portal primarily; Delaware entity registered agent is Northwest

Registered Agent in Dover at Northwest Registered Agent Service, Inc. 8 The Green, STE B

Dover, DE 19901 Kent County, Delaware via 1st class mail

**Binance:** lawenforcement@binance.us for the U.S. entity (BAM Trading, Miami)

**OKX:** enforcement@okx.com (global) and lawenforcement_OKCoinUSA@okcoin.com (U.S.)

**HitBTC:** legal@hitbtc.com

**Tronify:** hello@tronify.energy

/s/ Stevan Lieberman
Stevan Lieberman